# UNITED STATES DISTRICT COURT
## for the
### Southern District of California

In the Matter of the Search of  )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.  25-mj-01786 -DDL
)
Silver Android Smartphone (Seizure No. N-3) ("Target )
Device 3"); )
)

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-3

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) and 846 | Conspiracy to distribute controlled substances |

The application is based on these facts:

See attached affidavit of SA Miguel Ledezma, DEA

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Miguel Ledezma*
*Applicant's signature*

Miguel Ledezma, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: ___04/11/2025___

*David Leshner*
*Judge's signature*

City and state: San Diego, California     Hon. David D. Leshner, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A-3

PROPERTY TO BE SEARCHED

The following property is to be searched:

Silver Android Smartphone (Seizure No. N-3) ("**Target Device 3**");



**Target Device 3** is currently possession of the Drug Enforcement Administration, located at 2055 Sanyo Ave, San Diego, California, 92154.

# **ATTACHMENT B-3**

ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A-3 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of January 21, 2025, through March 20, 2025.

    a.    tending to indicate efforts to distribute controlled substances;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of controlled substances;

    c.    tending to identify co-conspirators, criminal associates, or others involved in transportation and distribution of controlled substances;

    d.    tending to identify travel to or presence at locations involved in the transportation and distribution of controlled substances, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Device 1**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 841, and 846.

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

I, Miguel Ledezma, Special Agent with the Drug Enforcement Administration ("DEA"), assigned to the San Ysidro California District Office, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a search warrant in furtherance of a narcotics investigation conducted by the Drug Enforcement Administration for the following the following electronic devices:

> 1) Black Samsung Android Smartphone (Seizure No. N-1) ("**Target Device 1**");
> 2) Black Samsung Android Smartphone (Seizure No. N-2) ("**Target Device 2**");
> 3) Silver Android Smartphone (Seizure No. N-3) ("**Target Device 3**", collectively the **Target Devices**);

as further described in Attachments A-1 and to seize evidence of crimes, as further described in Attachments B, specifically violations of Title 21, United States Code, Sections 841 and 846 (Target Offenses). The requested warrants relate to the investigation and prosecution of Steben Gabriel VELAZCO-Lara ("VELAZCO-Lara") and his associates for conspiracy to possess with intent to distribute approximately 10 kilograms of methamphetamine and 559 grams of fentanyl M30 pills seized during a vehicle stop. **Target Device 1** was found on top of VELAZCO-Lara's bed during the execution of the search warrant at 1480 Loma Lane, Chula Vista, CA 91911 ("Location 1"). **Target Device 2** was found inside a drawer of VELAZCO-Lara's nightstand at Location 1. **Target Device 3** was found inside a white Jetta driven by VELAZCO-Lara on top of the driver's seat belonging to VELAZCO-Lara. The **Target Devices** are currently being held at the DEA San Ysidro Division Office located at 2055 Sanyo Ave, San Diego, California. Given the extensive coordination and planning required for drug smuggling ventures, it is believed that the **Target Devices** were used by VELAZCO-Lara to communicate with co-conspirators leading up to his arrest, and that evidence regarding the smuggling event,

including GPS location data, route data, and information related to co-conspirators, may be contained on the **Target Devices**.

2. The information contained in this affidavit is based on my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining search warrant for **Target Devices,** it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## TRAINING AND EXPERIENCE

3. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am a Special Agent (SA) with the United States Drug Enforcement Administration (DEA) charged with enforcing Title 21 of the United States Code, the Controlled Substances Act. I am empowered and required by law to conduct investigations and make arrests under 21 U.S.C. § 878.

4. I am currently assigned to DEA Group 71, at the San Ysidro District Office (SYDO). I have been employed with the DEA since July 2023. My duties include the investigation and apprehension of individuals involved in drug trafficking and related activities. I have received formal training at the DEA Training Academy in Quantico, Virginia. My training includes the identification of many types of controlled substances by sight and odor.

5. During my employment with DEA, I have investigated and participated in investigations of illicit controlled substance trafficking, including the distribution of controlled substances within the United States and the importation of narcotics from Mexico to the United States. I have participated in multiple investigations for controlled substance violations, and during these investigations, I have used a variety of investigative techniques and resources, including physical and electronic surveillance, undercover and confidential source buy operations, search and tracking warrants, and the analysis of telephone records. Further, I have

2

participated in investigations in which drug traffickers relied heavily upon telephone communication and other electronic devices as a means of communicating. In addition, I have been trained in interviewing individuals who have been directly and indirectly involved in the importation, transportation, distribution and manufacturing of illegal drugs and controlled substances.

6. Based on my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods utilized in narcotics trafficking operations and some of the unique trafficking patterns employed by narcotics organizations. I know that drug traffickers often require the use of a telephone facility to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. I know that professional drug operations depend upon maintaining their extensive contacts. The telephone enables drug traffickers to maintain contact with associates, suppliers and customers. I also know that drug traffickers sometimes use fraudulent information, such as fictitious names and false addresses, to subscribe to communication facilities, especially cellular phones. Through these investigations, my training and experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics. I am also familiar with the methods employed by large-scale narcotics organizations in attempts to thwart detection by law enforcement including but not limited to the use of cellular telephone technology, counter surveillance techniques, false or fictitious identities and addresses, and coded communications. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including their methods of distribution, storage, and transportation of narcotics, their methods of collecting proceeds of narcotics trafficking, and their methods of laundering money to conceal the nature of the proceeds. Based on my training and experience, I know that drug trafficking at the retail level is largely a cash

business. I know that drug traffickers often generate large amounts of unexplained wealth, and through financial transaction, attempt to conceal, disguise or legitimize unlawful proceeds, through domestic and international banks and their attendant services, and otherwise legitimate businesses which generate large quantities of currency. In addition, drug traffickers often use drug proceeds to purchase additional narcotics to perpetuate and promote the ongoing conspiracy. I know that drug traffickers often use cellphones to communicate with co-conspirators in furtherance of their money laundering activities. During the course of my employment, I have also become familiar with the ordinary meaning of controlled substance slang and jargon, and with the methods of packaging, consuming and transferring of controlled substances. I am also familiar with the manners and techniques of traffickers in cocaine, cocaine, heroin, marijuana, and fentanyl as practiced locally, including the importation from Mexico.

7. Based on my training, experience, and consultation with other law enforcement officers experienced in narcotics tracking organizations, I am familiar with how traffickers communicate and operate. For example, I am aware that traffickers frequently discuss criminal activity using cellular telephones and often use coded language to obscure conversations about their unlawful activity, because they believe coded language makes it more difficult to identify their conduct. I am also familiar with the typical makeup and operation of trafficking organizations, including the transportation and concealment of narcotics, the collection of money which are proceeds of trafficking, the subsequent movement and distribution of proceeds, and other criminal activity.

8. Based on my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, I am aware that cellular devices (including their SIM card(s)) can and often contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent

4

files contained on or in the cellular device. Specifically, searches of cellular devices of individuals involved in the importation of narcotics may yield evidence:

    a.    tending to indicate efforts to possess, sell or distribute controlled substance;

    b.    tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, phone numbers – used to facilitate the distribution, sale or possession of controlled substances;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution, sale or possession of controlled substances;

    d.    tending to identify travel to or presence at locations involved in efforts to distribute, sell or possess controlled substances;

    e.    tending to identify the user of, or persons with control over or access to, **Target Devices**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

9.    On January 21, 2025, utilizing a Confidential Source[1] (CS), investigators conducted a controlled delivery of 1 kilogram of sham cocaine equipped with a GPS tracker to a courier associated to the MACHUCA DTO. On that date, at approximately 6:10 p.m., investigators observed a white Hyundai Sonata with a damaged rear bumper driving at a slow pace circling the designated pickup location. At approximately 6:17 p.m., the courier located the CS' vehicle parked in the south-end of the parking lot. Immediately after, the courier then proceeded to back-into the parking stall directly north of the CS' vehicle. Investigators observed the CS reach into the back of the CS' vehicle, grab the sham brick of cocaine and give it to the courier. During the transaction, the courier did not exit the white Hyundai Sonata. Following the transaction, investigators moved in to make contact and arrest the courier, however the courier immediately fled the scene.

10.    The CS indicated that because it was dark and the transaction occurred

---

[1] The CS has been a confidential source with the San Diego Sheriff's Department since November 2024. The CS is cooperating with the DEA in hopes of future charging consideration for potential Title 21 charges. Agents believe the CS has been truthful and have been able to corroborate some information that has been received. The CS has a DUI conviction from May of 2024.

5

quickly, he did not get a good look at the courier. He/she estimated that the courier was a Hispanic man in his 20s or 30s, clean shaven, with curly hair, and relatively short. On February 14, 2025 investigators met with the CS and showed a picture of VELAZCO-Lara taken during surveillance to the CS. Investigators asked the CS if he/she recognized the person in the image and the CS stated that there was a high probability that the person on the image was the same person he/she encountered on January 21, 2025, although he/she was not certain.

11. On January 22, 2025 at approximately 9:54 a.m., investigators found the same white Hyundai Sonata with a damaged rear bumper parked on Loma Lane, Chula Vista, CA. On the same date, investigators observed a Hispanic male (later identified as VELAZCO-Lara) get out from the white Hyundai Sonata and walk directly into 1480 Loma Lane, Chula Vista, CA (Location 1). Based on surveillance conducted in this investigation, I believe VELAZCO-Lara resides at that address.

12. On March 14, 2025 at approximately 11:20 a.m., investigators established surveillance in the vicinity of Location 1. At approximately 11:40 a.m., investigators observed a white Volkswagen Jetta driven by GASTELUM LOPEZ park in front of Location 1. Investigators observed GASTELUM LOPEZ exit the white Volkswagen Jetta and walk inside Location 1.

13. On the same date, at approximately 11:43 a.m., investigators observed GASTELUM LOPEZ exit Location 1 carrying a large red bag. Investigators observed GASTELUM LOPEZ on her cellphone as she momentarily waited on the driveway of Location 1. Shortly after, GASTELUM LOPEZ began walking northbound with the large red bag to a nearby elementary school located at 1450 Loma Lane, Chula Vista, CA 91911. During this time, investigators momentarily lost sight of GASTELUM LOPEZ after walking to the elementary school parking lot. While GASTELUM LOPEZ was in the school parking lot, investigators observed VELAZCO-Lara exit Location 1 while talking on the cellphone. Investigators then observed VELAZCO-Lara walk to the driveway of Location 1 and look in the direction of the school parking lot. At approximately 11:46 a.m.,

investigators observed GASTELUM LOPEZ walk back towards Location 1 empty handed.

14. After a search warrant was served on March 20, 2025, for Location 1 GASTELUM LOPEZ was interviewed and admitted that she delivered the large red bag on March 14 to an African-American male that was driving a white four door sedan with a black roof. GASTELUM LOPEZ further admitted that VELAZCO-Lara had asked her to deliver the large red bag to VELAZO-Lara's friend "Bob." Due to my training and experience, I believe that VELAZCO-Lara was coordinating GASTELUM LOPEZ to conduct a drug deal with the driver of the white four door sedan.

15. On March 20, 2025 DEA investigators from SYDO coordinated with Chula Vista Police Department (CVPD), San Diego Sheriff's Office (SDSO) and Homeland Security Investigations (HSI) to conduct surveillance on VELAZCO-Lara and execute two search warrants.

16. On March 20, 2025 at approximately 11:00 a.m., investigators established surveillance in the vicinity of Location 1. At approximately 1:00 p.m., investigators observed VELAZCO-Lara exit Location 1 with two large plastic and walk to a nearby elementary school parking lot. Investigators observed VELAZCO-Lara approach a grey Mazda SUV, driven by CO-CONSPIRATOR 1. Investigators then observed VELAZCO-Lara put the two large black bags into the trunk of the Mazda SUV and walk back to Location 1. Soon after, CO-CONSPIRATOR 1 drove the Mazda away under constant surveillance by investigators.

17. At approximately 1:50 p.m., the Mazda SUV drove into a gas station in El Cajon, CA. There, investigators observed as CO-CONSPIRATOR 1 parked the Mazda SUV at a gas station stall but did not exit the vehicle. Shortly after, investigators observed a white Tesla Model 3 park in the gas station parking lot driven by Patrick CARDWELL. Patrick CARDWELL rolled the driver side window down and waved to CO-CONSPIRATOR 1 in the Mazda SUV. CO-CONSPIRATOR 1 then drove the Mazda SUV over and parked next to the Tesla. Investigators then observed CO-CONSPIRATOR 1 exit the Mazda SUV, open the trunk and retrieve the two large black plastic bags, walk to the

7

Tesla, open the rear driver side door, and put the two bags in the Tesla. Patrick CARDWELL then drove the Tesla away from the gas station parking lot at a high rate of speed under constant surveillance of investigators.

18. At approximately 2:05 p.m., investigators followed the Tesla to a residence in El Cajon. There, investigators observed Patrick CARDWELL exit the Tesla, retrieve the two large black bags from the Tesla and walk inside the residence.

19. At approximately 5:20 p.m., investigators observed Patrick CARDWELL exit the residence with a large box and put it into the Tesla. Investigators observed Patrick CARDWELL depart the residence in the white Tesla.

20. At approximately 6:00 p.m., a SDSO marked unit initiated a traffic stop on the Tesla driven by Patrick CARDWELL in San Diego, CA. After a search of the Tesla, SDSO recovered approximately 9.16 kilograms of methamphetamine and 552.09 grams of fentanyl M30 pills.

21. At approximately 9:05 p.m., investigators observed VELAZCO-Lara inside a white Jetta that was parked in front of Location 1 where VELAZCO-Lara was taken into custody and detained without incident. At approximately 9:10 p.m., a search warrant was executed at Location 1. Shortly after, investigators found **Target Device 1** on top of VELAZCO-Lara's bed during the execution of the search warrant. **Target Device 2** was found inside a drawer of VELAZCO-Lara's nightstand. **Target Device 3** was found on top of the driver's seat of the white Jetta.

22. On March 21, 2025 at approximately 12:44 a.m., investigators conducted an audio/video recorded post-arrest interview of VELAZCO-Lara. Investigators began the post-arrest interview by reading VELAZCO-Lara his Miranda Rights. VELAZCO-Lara advised he understood his rights and was willing to speak to investigators. During the interview, VELAZCO-Lara stated that approximately four years ago he met a subject named "Alex" at Mariscos El Camaron in Chula Vista, CA. VELAZCO-Lara stated that "Alex" asked him if he wanted to make money delivering "stuff" for $100-$200 USD. VELAZCO-Lara stated that he agreed to work with "Alex".

8

23. VELAZCO-Lara further stated that "Alex" is the sibling of "El Mickey". VELAZCO-Lara advised investigators that "El Mickey" is associated with multiple DTOs, including Cartel Arellano Felix (CAF), and "La Rana". Investigators have previously identified "La Rana," a notorious drug trafficker, as Rene ARZATE GARCIA. VELAZCO-Lara further advised that "Alex" is also associated with a subject by the moniker of "El Piolin" or "El JP" who is a member of the Cartel Jalisco Nueva Generacion (CJNG) in Tijuana, Baja California, Mexico. VELAZCO-Lara further stated that he asked "Alex" who he was aligned with, to which "Alex" responded, "we are with some heavy hitters, it is better if you do not know."

24. VELAZCO-Lara advised investigators that "Alex" is also associated with a subject who VELAZCO-Lara knows as "Smith". VELAZCO-Lara stated that he has picked up bags from "Smith" on multiple occasions. VELAZCO-Lara claimed that he did not know what was inside the bags, but he remembers "Alex" mentioning that he worked with "aguas," a Spanish term for methamphetamine.

25. VELAZCO-Lara stated that "Alex" offered him $100.00 that day to deliver the bags to a friend of "Alex" because "Alex" had to go to work. VELAZCO-Lara further stated that on March 20, 2025, at approximately 12:30 p.m. – 1:00 p.m., he delivered the bags to a driver of a gray Mazda SUV near Location 1.

26. Based upon my experience and training, my knowledge of the investigation, and my consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and circumstances set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, photos, and other digital information are stored in the **Target Devices** and relate to the Target Offenses. In light of the facts above and my experience and training, there is probable cause to believe that VELAZCO-Lara was using the **Target Devices** to communicate with the DTO and other conspirators to further the distribution of illicit narcotics. Additionally, based on my training and experience, I know that planning narcotics smuggling events can take place over many weeks and months before drugs are

9

distributed. Based on my training and experience, it is also not unusual for individuals to attempt to minimize the amount of time they were involved in their trafficking activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for evidence of the crimes discussed herein and as set forth in Attachments A-1 through A-3 and B, beginning on January 21, 2025, up to and including March 20, 2025.

## METHODOLOGY

27. It is not possible to determine, merely by knowing a cellular device's make, model, and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can be tablets, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular devices do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular device models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

28. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the cellular phone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

29. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

30. Law enforcement has not previously attempted to obtain the evidence sought by the requested warrants.

## CONCLUSION

31. Based on the facts and information set forth above, I believe probable cause exists to conclude that the **Target Devices** were used to facilitate the Target Offenses. **Target Devices** were likely used to facilitate the offenses by transmitting and storing data, which constitutes evidence, fruits, and instrumentalities of violations of the Target Offenses. I also believe that probable cause exists to believe that evidence, fruits, and instrumentalities of illegal activity committed by VELAZCO-Lara and others continues to exist on **Target Devices**. Accordingly, I request that the Court issue warrants authorizing me, a Special Agent with DEA, or another law enforcement employee specially trained in digital evidence recovery, to search the items described in Attachments A-1, A-2, and A-3, and seize the items listed in Attachments B, using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge, information, and belief.

_____
Special Agent Miguel Ledezma
Drug Enforcement Administration

11

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this ▮ day of April 2025.

11th

*David Leshner*
Honorable David D. Leshner
United States Magistrate Judge

# ATTACHMENT A-3

PROPERTY TO BE SEARCHED

The following property is to be searched:

Silver Android Smartphone (Seizure No. N-3) ("**Target Device 3**");



**Target Device 3** is currently possession of the Drug Enforcement Administration, located at 2055 Sanyo Ave, San Diego, California, 92154.

17

# **ATTACHMENT B-3**

## ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A-3 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of January 21, 2025, through March 20, 2025.

a. tending to indicate efforts to distribute controlled substances;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of controlled substances;

c. tending to identify co-conspirators, criminal associates, or others involved in transportation and distribution of controlled substances;

d. tending to identify travel to or presence at locations involved in the transportation and distribution of controlled substances, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device 1**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 841, and 846.